IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

POTOMAC CONFERENCE                :
CORPORATION OF SEVENTH-DAY        :
ADVENTISTS,
d/b/a TAKOMA ACADEMY              :

    v.                              :    Civil Action No. DKC 13-1128

                                  :

TAKOMA ACADEMY ALUMNI
ASSOCIATION, INC., et al.         :

                                  :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Lanham Act trademark infringement and unfair competition case is a motion for a preliminary injunction filed by Plaintiff Potomac Conference Corporation of Seventh-Day Adventists d/b/a Takoma Academy ("Potomac Conference" or "Takoma Academy" or "Plaintiff") only as to Defendant Takoma Academy Alumni Association, Inc. ("TAAA, Inc." or "incorporated alumni association" or "Defendant").[1] (ECF No 12). The issues have been fully briefed and a preliminary injunction hearing was held on August 22-23, 2013.[2] On September 5, 2013, the parties

_____

[1] Although Plaintiff lodges the complaint against two defendants – TAAA, Inc. and Henry Pittman, TAAA, Inc.'s former president – Plaintiff seeks the preliminary injunction only against TAAA, Inc.

[2] On August 29, 2013, Plaintiff submitted a post-hearing supplemental brief. Subsequently, TAAA, Inc. filed a motion to

jointly requested to refer the matter to a magistrate judge for mediation. The case was subsequently referred to Magistrate Judge Jillyn K. Schulze for ADR. A settlement conference was held on October 21, 2013, but no settlement was reached (ECF No. 31). For the reasons that follow, Plaintiff's motion for a preliminary injunction will be granted.

## I. Background

### A. Factual Background

The following facts are based on the current record. This case involves a dispute between a school and an alumni association. Takoma Academy is a secondary school that provides educational services to children from grades nine (9) through twelve (12). The Potomac Conference owns and operates a number of Seventh-day Adventist churches and schools, including Takoma

strike this document. Defendant's motion to strike does not seek to strike any portion of a pleading; rather it aims to strike a document that Plaintiff submitted after a hearing. *See* Fed.R.Civ.P. 7(a). Federal Rule of Civil Procedure 12(f) allows the court to strike certain matters "from a pleading." Pursuant to Federal Rule of Civil Procedure 7(a), "pleadings" include a complaint, a counterclaim, a third-party complaint, an answer, and a reply, if ordered. Rule 12(f) may only address the papers listed in Rule 7(a). *See, e.g., Hrivnak v. NCO Portfolio Mgmt., Inc.*, 723 F.Supp.2d 1020, 1029 (N.D.Ohio 2010) ("While some courts have employed Fed.R.Civ.P. 12(f) to strike an affidavit or a brief, or portions thereof, there is no basis in the Federal Rules for doing so."). Because there is no basis in the Federal Rules for striking Plaintiff's post-hearing supplement, Defendant's motion to strike is denied. Defendant alternatively requested that the court provide an opportunity for Defendant to respond to Plaintiff's post-hearing supplement. No response to Plaintiff's supplemental submission is necessary to resolve the pending motion.

Academy.  Washington Training Institution founded Takoma Academy in 1904; Takoma Academy then became a separate institution as part of the Potomac Conference in 1934.  (ECF No. 1 ¶ 10).  The school has used names "Takoma Academy" and "TA" since it was founded in 1904.  (Testimony of Keith Hallam).  Furthermore, "students, faculty, and friends" of Takoma Academy know the school as "TA."  The school uses "Takoma Academy" and "TA" on its letterhead, on signs, and in newsletters.  (*Id.*).

Several Takoma Academy faculty members established the Takoma Academy Alumni Association ("TAAA" or "unincorporated alumni association") in the 1970s during J.P. "Prof Laurence's" tenure as principal of Takoma Academy.  (Pl.'s Hr'g Ex. 6, Plaintiff's Fact Sheet (Apr. 17, 2013)); (*see also* Pl.'s Hr'g Ex. 12, Letter from Richard Osborn dated April 1, 1977).  Dr. Richard Osborn, a faculty representative from Takoma Academy, worked with "Prof Laurence" and "spearheaded the formation of the [Takoma Academy Alumni Association]."  (*Id.*).  Both school alumni and representatives from Takoma Academy served on the nineteen (19) - member alumni board.  (*Id.*).  Takoma Academy oversaw TAAA and controlled its finances and assets.  (ECF No. 12, at 2).  Specifically, TAAA's Constitution and By-Laws from April 1989 provides that:

> [s]uch funds as may be necessary to carry
> out the purposes of the Association shall be
> provided by the Treasurer of Takoma Academy

in accordance with the procedures and
authorizations as may be established from
time to time by the Principal or the Board
of Trustees of Takoma Academy. All funds
received by the Association from any source
whatsoever will be remitted to Takoma
Academy to be held by the Treasurer, either
as part of the general funds of Takoma
Academy or segregated in accordance with
limitations that may be imposed by any gift.

(Pl.'s Hr'g Ex. 19, Takoma Academy Alumni Association
Constitution and By-Laws). TAAA also traditionally operated
under Takoma Academy's tax-exempt umbrella. (Pl.'s Hr'g Ex. 6,
Plaintiff's Fact Sheet). Takoma Academy further provided a gift
receipt to donors who contributed to TAAA for donors to qualify
for a tax exemption. (*Id.*). Takoma Academy also maintained a
database of alumni contact information through Rick Feldman, a
Takoma Academy alumnus. (Testimony of Keith Hallam and David
Daniels).

Henry Pittman ("Pittman"), a Takoma Academy alumnus, became
TAAA's president in April of 2011. TAAA and Takoma Academy
eventually disagreed about the mission of the alumni association
and the level of control that Takoma Academy should exercise
over the alumni association. Based on testimony at the
preliminary injunction hearing, the alumni association, under
Mr. Pittman's leadership, wanted to raise funds for individual
Takoma Academy alumni in addition to fundraising for the school
and its students. (Pl.'s Hr'g Ex. 31, Message from TAAA, Inc.'s

Board of Directors dated January 30, 2013). Furthermore, the alumni association wished "fundraising to occur independently of the [Takoma Academy] Board's approval and the Board's control over funds." (*Id.*). Consequently, on April 10, 2012, without authorization from Takoma Academy, (ECF No. 12-2, at 1 (affidavit of David Daniels)), Mr. Pittman filed Articles of Incorporation with the Maryland State Department of Assessments and Taxation to incorporate the alumni association and establish Takoma Academy Alumni Association, Inc. ("TAAA, Inc." or "incorporated alumni association"). (Pl.'s Hr'g Ex. 20, Articles of Incorporation dated April 10, 2012).

On May 31, 2012, one month after the incorporation of the alumni association, Plaintiff filed a trademark application with the United States Patent and Trademark Office ("USPTO") for the term "Takoma Academy," and the USPTO registered the mark on February 5, 2013. (Pl.'s Hr'g Ex. 1, Plaintiff's registration of "Takoma Academy"). On May 7, 2013, Plaintiff also registered the "Takoma Academy" design mark, with the initials "TA" appearing in the middle of the seal, superimposed over each other. The stylized term and year "EST. 1904" appear at the bottom of the seal inside concentric circles. The certificate of registration indicates that the design mark has been used in commerce since December 31, 2006. (Pl. Hr'g Ex. 65). The

certificate of registration indicates that the design mark was registered on February 26, 2013, but corrected on May 7, 2013.

Then, on June 7, 2012, the Takoma Academy Board of Trustees "voted to withdraw support and disassociate the school from TAAA, Inc. and promptly gave notice of such action to Defendants." (ECF. No. 12-2, at 2 (affidavit of David Daniels)). On June 14, 2012, Keith Hallam, the Vice President of Education for Potomac Conference of Seventh-Day Adventists, sent an email to Mr. Pittman informing him of this decision and requested that Mr. Pittman "cease using the name Takoma Academy or holding [his] organization as in any way associated with Takoma Academy." (Pl.'s Hr'g Ex. 55, Letter from Keith Hallam dated June 14, 2012). Mr. Hallam further requested that "all monies being held by [TAAA, Inc.] be returned to the school along with alumni rosters and contact information." (*Id.*).

On July 9, 2012, after Mr. Pittman incorporated the alumni association, the TAAA Board voted to approve the incorporation. (Pl.'s Hr'g Ex. 25, July 9, 2012 Board of Directors Meeting Minutes). On July 29, 2012, TAAA, Inc. held a membership vote "to affirm the officers' decision to have the governance of . . . association remain with alumnus." (Pl.'s Hr'g Ex. 27, Message from Pittman dated August 2, 2012). Thirteen alumni association members voted "to affirm officers' decision to have the governance of the Takoma Academy Alumni Association, Inc. remain

with alumnus and not under the governance of the Board of Trustees of Takoma Academy and/or the Potomac Conference of the Seventh-day Adventist Church." (Pl.'s Hr'g Ex. 58, Voting Ballot from July 29, 2012).

On January 17, 2013, Takoma Academy sent a second Cease and Desist letter addressed to Mr. Pittman, demanding that "any and all use of the name Takoma Academy and TA, or any derivatives thereof, immediately cease" and to "*immediately return* to Takoma Academy all databases, alumni lists and other property belonging to Takoma Academy which were given to [Pittman] when [he] became president of the Takoma Academy Alumni Association." (Pl.'s Hr'g Ex. 2, Cease and Desist Letter dated January 17, 2013) (emphasis in original).

On March 21, 2013, Mr. Pittman filed an Application for Recognition of Exemption under Section 501(c)(3) of the Internal Revenue Code ("Form 1023) with the Internal Revenue Service ("IRS"), which was approved on May 31, 2013. (Pl.'s Hr'g Ex. 57, TAAA, Inc.'s Application for 501(c)(3) status). In the "history" section of the application, Mr. Pittman answered "no" to the question of whether TAAA, Inc. is "a successor to another organization." (*Id.* at 5).

Instead of ceasing to use "Takoma Academy" and "TA," as requested in Plaintiff's Cease and Desist letters, on April 12, 2013, TAAA, Inc., through the law firm of Finnegan, Henderson,

Farabow, Garrett & Dunner, LLP, sent Takoma Academy its own Cease & Desist letter demanding that Takoma Academy "[i]mmediately cease and desist from all further use of the TAKOMA ACADEMY ALUMNI ASSOCIATION MARK" and "[r]emove all such materials utilizing the TAKOMA ACADEMY ALUMNI ASSOCIATION mark online or otherwise in its possession or control, including all copies in electronic or printed form." (Pl.'s Hr'g Ex. 8, Cease and Desist Letter from Defendant, dated April 12, 2013).

That same day, on April 12, 2013, TAAA, Inc. filed an application with the USPTO to register the service mark "Takoma Academy Alumni Association" for "[a]ssociation services, namely promoting interests of alumni of Takoma Academy." (Pl.'s Hr'g Ex. 53, Registration of "Takoma Academy Alumni Association" mark). Plaintiff maintains that Takoma Academy continues to have an alumni association, TAAA, and that "TAAA, Inc. is not in any way associated with or sponsored by Takoma Academy." (*Id*.). (Pl.'s Hr'g Ex. 7, Letter from Potomac Conference dated April 18, 2013; *see also* ECF No. 12-3, at 2 (Affidavit of Takoma Academy)). TAAA elected a new president on April 28, 2013. (ECF No. 12-3, at 2 (Affidavit of Takoma Academy)).

Plaintiff alleges that after the incorporation and even after Takoma Academy disassociated from TAAA, Inc. on June 7, 2012 and sent a second Cease and Desist Letter on January 17, 2013, TAAA, Inc. continued – and still continues – to use

"Takoma Academy," "TA," "Takoma Academy Alumni Association," and
"TAAA" in communications with Takoma Academy alumni. (ECF No.
12-1, at 4). Plaintiff identifies numerous allegedly infringing
acts. First, Defendant uses "Takoma Academy Alumni Association"
and "Takoma Academy Alumni Association, Inc." interchangeably in
communicating with alumni. (*Id.*); (*see also* Pl.'s Hr'g. Exs.
33, 34). For instance, ongoing notices from TAAA, Inc. to
alumni about upcoming events use both "Takoma Academy Alumni
Association" and "Takoma Academy Alumni Association, Inc."
interchangeably. (Pl.'s Hr'g. Exhs. 33 – 41, missives from
TAAA, Inc.). Furthermore, several missives from TAAA, Inc. are
titled "Takoma Academy Alumni Association," but Defendant signs
as "[y]our Takoma Academy Alumni Association, Inc . . . circa
1977," which Plaintiff asserts suggests that TAAA, Inc. is the
same unincorporated alumni association that continues to exist
under Takoma Academy. (*Id.*, Exs. 35-37; *see also* Pl.'s Hr'g Ex.
36 (announcement from TAAA, Inc. about appointment of Board of
Directors under the heading "Takoma Academy Alumni
Association")). Defendant further makes statements such as
"TAAA, Inc., *your* alumni association . . ." in its missives to
Takoma Academy alumni. (Pl.'s Hr'g Ex. 32, Letter from Henry
Pittman dated March 8, 2013) (emphasis added)).

Moreover, both Plaintiff and TAAA, Inc. host competing
alumni events referencing "Takoma Academy" in their promotional

materials to alumni.  (Pl.'s Hr'g Exs. 3, 4; *see also* ECF No. 12, at 5).  For instance, both TAAA and TAAA, Inc. hosted golf tournaments for alumni the weekend of April 26-28, 2013.  (*Id.*). Both organizations also fundraise and attempt to collect donations from the same alumni population.  (ECF No. 1-2, at 18 (message from Pittman)).

Additionally, TAAA, Inc. operates a website, www.taalumni.org, which is replete with references to "TA Alumni," "Takoma Academy," and the "Takoma Academy Alumni Association."  (Pl.'s Hr'g Ex. 42, TAAA, Inc.'s website).  On January 29, 2013, TAAA, Inc. also created a page on the *LinkedIn* website,[3] in which it references "TAAA" and Takoma Academy Alumni.  (Pl.'s Hr'g Ex. 43, *LinkedIn* page of Takoma Academy Alumni Association, Inc.).  Finally, TAAA, Inc. maintains a Facebook page that includes the logo "The Official Takoma Academy Alumni Association (TAAA)" and which alumni can join, "like," and on which they can post comments.  (Pl.'s Hr'g Ex. 45, TAAA, Inc.'s Facebook Page).

Plaintiff asserts ownership of the marks and maintains that the above activity and Defendant's continued use of "Takoma Academy," "TA," "Takoma Academy Alumni Association," and "TAAA" creates a likelihood of confusion and has caused actual

---

[3] *LinkedIn* is a professional network that includes individual and company profiles and groups.

confusion among alumni and the general public. Specifically, Plaintiff contends that several Takoma Academy alumni have contacted the school "regarding their confusion over the purported affiliation between TAAA, Inc. and Takoma Academy." (ECF No. 12-3, at 1 (affidavit of Takoma Academy)). Alumni have submitted emails expressing their confusion over the use of the marks by both Plaintiff and TAAA, Inc. and questioned which alumni association is real or fake. (ECF No. 12-6, 12-7).

**B.  Procedural History**

Plaintiff filed a complaint on April 16, 2013, alleging four types of claims: (1) trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a) (against both TAAA, Inc. and Mr. Pittman); (2) vicarious trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a) (against Mr. Pittman); (3) common law unfair competition (against TAAA, Inc. and Mr. Pittman); and (4) conversion by wrongful detention (against TAAA, Inc. and Mr. Pittman). (ECF No. 1 ¶¶ 31-67).

Plaintiff sought a preliminary injunction only against Defendant TAAA, Inc. on June 28, 2013. (ECF No. 12). Defendant TAAA, Inc. opposed Plaintiff's motion for a preliminary injunction on August 9, 2013 (ECF No. 17) and Plaintiff replied on August 16, 2013. (ECF No. 18). During a two-day hearing on Plaintiff's motion for a preliminary injunction, Plaintiff

presented testimony from the following witnesses: Sharon Froom, a 1976 Takoma Academy graduate; Dr. Hamlet Canosa, Vice President for Education at the Columbia Union Conference and a former member of the Takoma Academy Board of Directors; Keith Hallam, Vice President of Education for Potomac Conference of Seventh-Day Adventists; Ellen Nixon, a 1957 Takoma Academy graduate and former Treasurer of the unincorporated alumni association and Takoma Academy; David Daniels, former Principal of Takoma Academy from July 2009 through June 30, 2012, who served as the Chief Executive Officer of the Takoma Academy campus; Ronnie Earl Mills, assistant to the principal for fundraising and alumni affairs. TAAA, Inc. then presented testimony from the following witnesses: Henry Pittman, former President of TAAA since April of 2011, and as of March 2013, former president of TAAA, Inc.; Cathy Mills, former president of TAAA from the late 1980s to the early 1990s, and the current president of TAAA, Inc.

On August 29, 2013, Plaintiff filed a post-hearing supplemental letter. (ECF No. 25). Defendants then moved to strike Plaintiff's letter on August 30, 2013, (ECF No. 26), and Plaintiff opposed this motion on September 10, 2013 (ECF No.

29).  As stated above, Judge Schulze held a settlement conference on October 21, 2013, but the parties did not settle.[4]

## II.  Analysis

A preliminary injunction is an extraordinary remedy and will only be granted if the plaintiff clearly establishes that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *rev'd on other grounds*, 559 U.S. 1089 (2010). Plaintiff must prove all four elements to obtain relief.

### A.  Likelihood of Success on the Merits

To prevail on a trademark infringement and unfair competition claim under Sections 32(1) and 43(a) of the Lanham

---

[4] On December 6, 2013, Plaintiff filed a letter stating that despite representations made at the preliminary injunction hearing, TAAA, Inc. continues to use the word "official" "in connection with its description of itself and its activities" on Facebook, and representing to alumni that it is the successor to the unincorporated alumni association.  (ECF No. 32).  Defendant responded on December 20, 2013, explaining that "Facebook policy only allows Groups with over 200 'likes' to change its name only . . . [a]s no ruling has been issued on the preliminary injunction, let alone the fact that mediation has not formally been concluded, Defendant was unsure as to the proper alternative name for the Group Page."  (ECF No. 33, at 3). Plaintiff replied on December 27, 2013.  (ECF No. 34).  The parties essentially relitigate their positions in these submissions.

Act, a plaintiff must show that it "has a valid, protect[a]ble trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).[5]   On a preliminary injunction, plaintiff must show that it is likely to succeed on the merits.

---

[5] Section 32 of the Lanham Act applies to registered marks, and provides that:

> (1) Any person who shall, without the consent of the registrant-
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).  Section 43(a) of the Lanham Act applies to unregistered marks, and provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to

## 1.   Validity, Protectability, and Ownership of the Marks

At issue in this case is Defendant's use of the following marks and initials/abbreviations: "TAKOMA ACADEMY," "TA," "TAKOMA ACADEMY ALUMNI ASSOCIATION," and "TAAA."

"For a plaintiff to prevail on a claim of trademark infringement, the plaintiff must first and most fundamentally prove that it has a valid and protectable mark." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 340 (4th Cir. 2001). Registration of a trademark is *prima facie* evidence that the registrant owns the trademark and it is valid. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002). The certificate of registration supplies "the registrant [with] . . . prima facie evidence that its mark is not generic in the eyes of the relevant public . . . and that its mark . . . at a minimum is descriptive *and* has obtained secondary meaning." *America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001) (emphasis in original). "[T]he Commissioner [of Patents and Trademarks] need not require evidence of secondary meaning

---

the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

if the applied-for mark is inherently distinctive by being suggestive, arbitrary, or fanciful." *Id.* This is a significant procedural advantage for the registrant. *See Retail Servs., Inc. v. Freebies Publishing*, 364 F.3d 535, 542 (4th Cir. 2004). "Because the PTO may not register a generic mark, the fact that a mark is registered is strong evidence that the mark satisfies the statutory requirements for the distinctiveness necessary for trademark protection." *Id.; see also* 15 U.S.C. §§ 1052(e), (f), 1057(b). "Without a certificate of registration, the owner would be required to establish that the disputed mark was sufficiently distinctive to warrant trademark protection in the first place." *Id.; see also Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1529 (4th Cir. 1984). The effect of the presumption is to satisfy the burden of the entity seeking trademark protection in the absence of rebutting evidence. *See America Online*, 243 F.3d at 818; *see also Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002) ("In trademark terms, the registration is not absolute but is subject to rebuttal. In essence, the registration discharges the plaintiff's original common law burden of proving validity in an infringement action.").

Registration thus grants a presumption of ownership in the trademark, and the party challenging the registrant's ownership "must overcome the presumption by a preponderance of the

evidence." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 *F.3d 383*, 400 n.15 (4th Cir. 2009) (*citing Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775-76 (9th Cir. 1981)). Nevertheless, the United States Court of Appeals for the Fourth Circuit has noted that "[t]o acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Emergency One, Inc. v. American Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 267 (4th Cir. 2003).

    a.  **"Takoma Academy"**

"Takoma Academy" is the only service mark at issue which Plaintiff registered.[6] Specifically, Plaintiff registered the "Takoma Academy" mark on February 5, 2013. (Pl.'s Hr'g Ex. 1, Plaintiff's registration of "Takoma Academy"). 15 U.S.C. § 1065 provides that a mark becomes incontestable if it has "been in continuous use for five consecutive years subsequent to the date of . . . registration and is still in use in commerce." Because Plaintiff has not used the registered "Takoma Academy" mark for five consecutive years subsequent to the February 5, 2013 registration, Plaintiff is entitled to a rebuttable presumption

---

[6] Although *Defendant* has applied to register "Takoma Academy Alumni Association" with the USPTO (*see* ECF No. 12-8), the record does *not* indicate that the USPTO has approved the application and issued a certificate of registration.

of ownership and the mark is contestable. *See* 15 U.S.C. § 1065. Any persons challenging a registrant's ownership may assert all available legal or equitable defenses or defects, such as the lack of ownership by the registrant. *See* 15 U.S.C. § 1115(a). The challenger bears the burden of refuting the registrant's presumption of ownership. *See Brittingham v. Jenkins*, 914 F.2d 447, 455 (4th Cir. 1990).

Thus far, TAAA, Inc. has not rebutted the presumption of ownership that attached to the "Takoma Academy" mark by way of the registration. Defendant argues that Plaintiff's presumption of ownership of the "Takoma Academy" mark is limited to the context in which it was registered, namely for educational services only and *not* for alumni affairs. (ECF No. 17, at 6). The Fourth Circuit has not adopted such a narrow view of trademark registration. *See Synergistic Intern., LLC v. Korman*, 470 F.3d 162, 173-74 (4th Cir. 2006) (holding that the PTO's registration of a suggestive mark should be broadly construed, and the appropriate reading is not limited to the text of the mark's registered purpose). Plaintiff's certificate of registration for the mark "Takoma Academy" states the purpose as "educational services, namely providing courses of instruction at the secondary (9th-12th grade) level, in class 41." (Pl.'s Hr'g Ex. 1, Certificate of Registration). In *Synergistic International*, the court refused to limit the scope of the

mark's protection to the context in which it was registered. The mark at issue in *Synergistic International* was registered for use in connection with the "installation of glass in buildings and vehicles." Defendant in that case argued that plaintiff could not own the exclusive right to use its mark in connection with the repair of windshields because it was never registered for that purpose. The Fourth Circuit disagreed, finding windshield repair and windshield installation to be related services; the court was guided by the principle that a mark is entitled to protection against "the same or a confusing mark on the same product, or related products, and even on those which may be considered by some to be unrelated but which the public is likely to assume emanate from the trademark owner." *Synergistic Intern.*, 470 F.3d at 173 (*quoting Pizzeria Uno*, 747 F.2d at 1527).

Educational services that a school provides inherently encompass alumni activities associated with that school and would be considered related products. *See Villanova Univ. v. Villanova Alumni Educ. Found., Inc.,* 123 F.Supp.2d 293, 302 (E.D.Pa. 2000) (noting that the presumption of validity, protectability and ownership of Villanova University's marks also *extended to* charitable services because the "educational activities of a non-profit educational institution inherently encompass charitable services . . . [and] [t]hus, the

registration certificate logically extends to the University's use of these marks in fundraising activities that are necessary to support its education and entertainment activities."). As Plaintiff points out, alumni services are "necessary, inherent and natural activities undertaken by the school in furtherance of its educational services and mission." (ECF No. 18, at 15). Based on the current record, Takoma Academy founded the unincorporated alumni association in the 1970s, the alumni association operated under Takoma Academy's umbrella since the 1970s, the alumni association's finances were conducted and coordinated by and through the school pursuant to the Constitution and By-Laws, and Takoma Academy maintained alumni information. (ECF. No. 1 ¶¶ 12-13). Although the registration certificate for "Takoma Academy" does not specify alumni services, it appears that the registration logically extends to the school's use of "Takoma Academy" in alumni activities, the fundraising from which is used to support its education initiatives and extracurricular activities. Accordingly, the current record supports that Plaintiff has shown a likelihood of establishing that "Takoma Academy" is a valid and protectable mark.

### b. "Takoma Academy Alumni Association"

Plaintiff has not registered "Takoma Academy Alumni Association." Whether an unregistered mark is protected under federal law depends upon its classification – either as "generic," "descriptive," "suggestive," or "arbitrary/fanciful." *See U.S. Search*, 300 F.3d at 523. Thus, the degree of protection accorded to a mark hinges on the extent of its distinctiveness. *Retail Servs. Inc.*, 364 F.3d at 538 (*quoting Two Pesos, Inc. v. Taco Cabana Inc.*, 505 U.S. 763, 768 (1992)). Marks that are suggestive or arbitrary are considered "strong and presumptively valid" and are entitled to trademark protection. *Pizzeria Uno,* 747 F.2d at 1527. In contrast, a descriptive mark is entitled to protection only upon proof of secondary meaning. *Id.* "Descriptive marks merely describe a function, use, characteristic, size, or intended purpose of the product." *Id.* In contrast, "[a] mark is suggestive if it connotes, without describing, some quality, ingredient, or characteristic of the product." *Retail Servs. Inc.*, 364 F.3d at 539 (quotations, citations, and brackets omitted). The clearest way to distinguish between a descriptive and suggestive mark is to look to the manner in which the mark's message is conveyed: "if the mark imparts information directly, it is descriptive," but [i]f it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive."

*George & Co.*, 575 F.3d at 394 (*quoting Pizzeria Uno*, 747 F.2d at 1528).

The distinction between suggestive and descriptive marks is an important one, as suggestive marks are treated as inherently distinctive, while descriptive ones are not. *OBX-Stock*, 558 F.3d at 394. The Lanham Act thus "accord[s] protection [to descriptive marks] only if they have acquired a 'secondary meaning.'" *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 148 (4th Cir. 1998). Saying that a trademark has acquired "secondary meaning" means that a descriptive mark has become sufficiently distinctive to establish "a *mental association* in buyers' minds between the alleged mark and a single source of the product." 2 McCarthy on Trademarks and Unfair Competition § 15:5 (4th ed. updated Dec. 2013); *Sara Lee*, 81 F.3d at 464 (explaining that "secondary meaning" exists when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." (internal quotation marks omitted)).[7]

---

[7] As McCarthy explains, "[w]hile the 'focus' of secondary meaning is the 'consuming public,' it need not be proven among the *general* public if a product is targeted at only a specific segment of the general public." 2 McCarthy on Trademark and Unfair Competition § 15:46 (4th ed. updated Dec. 2013); *President & Trustees of Colby College v. Colby College-New Hampshire*, 508 F.2d 804, 808 (1st Cir. 1975) (College could prove secondary meaning by showing "the congruence of its name and its institution in the minds of an appreciable number of individuals broadly associated with other institutions of higher education

Here, both parties seem to agree that "Takoma Academy" is a descriptive mark.[8]   Even absent a presumption of validity and ownership afforded to "Takoma Academy" from its registration, as will be seen, Plaintiff has shown a likelihood of success in demonstrating that it acquired common law rights to "Takoma Academy" and "Takoma Academy Alumni Association" and that both have acquired secondary meaning.

First, the registration certificate for "Takoma Academy" reflects that the mark was first used in commerce on December 31, 1904.  (Pl.'s Hr'g Ex. 1, Registration Certificate).   Based on testimony from Keith Hallam, Plaintiff has since used the mark continuously, and it is prominently displayed on the school

---

in a given geographic area"); *Centaur Commc'ns, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2$^{d}$ Cir. 1987) ("[I]t is only necessary to show that a substantial segment of the *relevant group of consumers* made the requisite association between the product and the producer.") (emphasis added).

[8]  Although neither party addresses this in their briefs, "Takoma Academy Alumni Association" may be a collective membership mark, which is a trademark "used by the members of a cooperative, association, or other collective group or organization." *Nat'l Bd. for Certification in Occupational Therapy, Inc. v. American Occupational Therapy Assoc.*, 24 F.Supp.2d 494, 503 n.6 (D.Md. 1998) (*quoting* 15 U.S.C. § 1127); *see also Villanova*, 123 F.Supp.2d at 296 (noting that "Villanova Alumni Association" is a collective membership mark that identified members of the alumni association and was used in connection with services offered by the alumni association and Villanova graduates).   As will be seen, regardless of whether "Takoma Academy Alumni Association" is a collective membership mark, Plaintiff has demonstrated a likelihood that "Takoma Academy Alumni Association" acquired secondary meaning among alumni.

building, letterhead, correspondence, bills, direct mailings, and school and alumni newsletters. (*See also* ECF No. 17-2). With respect to "Takoma Academy Alumni Association," Ellen Nixon, who served as Takoma Academy's Treasurer (and subsequently TAAA's Treasurer) from 1972-1986, testified that in the 1970s, Takoma Academy's principal appointed a faculty member, Mr. Osborne, to create the Takoma Academy Alumni Association. David Daniels, former Principal of Takoma Academy from July 2009 through June 30, 2012, and Chief Executive Officer of the Takoma Academy campus, testified that Plaintiff used the term "Takoma Academy Alumni Association" in mailings, in planning activities and weekend events, and in soliciting funds and support from alumni.[9] Mr. Davis also testified that Plaintiff used the name "Takoma Academy Alumni Association" in planning alumni week.

Mr. Daniels further testified that Plaintiff established the "worthy student fund," which the school operated to provide tuition scholarships to students. According to Mr. Daniels, the money Takoma Academy Alumni Association raised was used to support this fund, and donors to TAAA received a tax deduction receipt as a result of the donation. By contrast, Mr. Davis

---

[9] Mr. Davis indicated during cross-examination that the school generated the mailings, including newsletters, in conjunction with the unincorporated alumni association, using the name "Takoma Academy Alumni Association."

testified that individuals who donated to TAAA, Inc. and asked for tax deduction receipts from Plaintiff were denied because the school was not associated with TAAA, Inc. This testimony that Takoma Academy gave tax deduction receipts to donors to Takoma Academy Alumni Association, and donors subsequently sought such deductions from Takoma Academy when they contributed to TAAA, Inc., suggests that alumni associate "Takoma Academy Alumni Association" with Plaintiff. Similarly, in addressing whether "Villanova Alumni Association" acquired secondary meaning, the *Villanova* court answered the question in the affirmative, noting that "[l]ike 'Villanova' and 'Villanova University,' the primary significance of 'Villanova Alumni' is identification with the plaintiff." 123 F.Supp.2d at 303. Much like in *Villanova*, Mr. Daniels testified that the alumni association functioned as part of the academy. As evidenced by the testimony, consumers of the alumni association's services affiliated "Takoma Academy Alumni Association" with Plaintiff. Accordingly, based on the present record, Plaintiff has established a likelihood of success in showing that "Takoma Academy Alumni Association" acquired secondary meaning.

In addition to the question of the mark's distinctiveness, the parties dispute its ownership. TAAA, Inc. asserts that it is a successor in interest to TAAA, and has used the name "TAKOMA ACADEMY ALUMNI ASSOCIATION" exclusively, openly, and

notoriously for over forty years (since the 1970s). (ECF No. 17, at 4). TAAA, Inc. argues that it, rather than Takoma Academy, acquired common law rights to "Takoma Academy Alumni Association" before Plaintiff registered the mark "Takoma Academy"; TAAA, Inc. contends that TAAA, the alleged predecessor to TAAA, Inc., was the prior user of the mark. Defendant presumably asserts this to challenge Plaintiff's ownership over both "Takoma Academy" and "Takoma Academy Alumni Association." The present record does not support Defendant's position.

Even if TAAA, Inc. is the successor in interest to TAAA, a point that need not be reached to resolve the instant dispute, TAAA, Inc. at best had an implied license to use "Takoma Academy" or "Takoma Academy Alumni Association." An implied license "arises out of the objective conduct of the parties, which a reasonable man would regard as indicating that an agreement has been reached." *Allen-Myland v. Int'l Bus. Mach. Corp.*, 746 F.Supp. 520, 549 (E.D.Pa. 1990); *see also Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, No. 3:12CV303-HEH, 2012 WL 2505282, at *3 (E.D.Va. June 28, 2012) ("[t]he existence of an implied trademark license is a factual issue which turns on the objective conduct of the parties."). A significant factor to be considered in this factual analysis is the existence of a special interlocking relationship between entities. *Diamonds Direct, USA, Inc.*, No., 3:12CV303-HEH, 2012 WL 2505282, at *3.

Permission to use the trademarks coupled with the exercise of reasonable control over such use suggests that an implied license existed between the parties, even where no contract was made. *See United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140 n.7 (3$^d$ Cir. 1981) ("The district court found . . . that state and local chapters affiliated with the United States Jaycees were permitted *during the term of the affiliation* to use the National's trade and service marks. Thus some type of license agreement existed." (emphasis added)). Furthermore, to determine the existence of an implied license, one must determine if the person is engaging in acts that would be infringing the trademark without an implied license. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997).

At this juncture, Plaintiff has demonstrated the likelihood that Takoma Academy, rather than TAAA, Inc., owned the marks. Whatever right the alumni association obtained to use the name existed by way of an implied license from the school. *See Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F.Supp. 212, 218 (S.D.N.Y. 1996) (since the license did not give the licensee the right to transfer its license rights, those rights were personal). As the Supreme Court of the United States observed, "[w]here consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and

27

silence merely, 'it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.'" *Menendez v. Holt*, 128 U.S. 514, 524 (1888). Testimony from the preliminary injunction hearing suggests that Plaintiff formed TAAA in the 1970s and authorized the alumni association to raise funds to support the school and its students. Keith Hallam testified that before incorporation, Takoma Academy permitted TAAA to use the name because the school and the unincorporated alumni association had a working relationship.[10] The evidence to date suggests that Takoma Academy exercised a sufficient degree of control over TAAA's operation such that it is likely an implied license was created. First, based on the evidence, Takoma Academy faculty members and students founded the alumni association. (Pl.'s Hr'g Ex. 6, Plaintiff's Fact Sheet (Apr. 17, 2013)); (*see also* Pl.'s Hr'g Ex. 12, Letter from Richard Osborn dated April 1, 1977). Ellen Nixon, who served as Takoma Academy's Treasurer from 1972–1986 and was employed by the school when the alumni association was established, testified that former students requested from the principal that Takoma Academy create an alumni association.

---

[10] Mr. Hallam also testified that the incorporated alumni association, under Mr. Pittman's leadership, had a different mission than TAAA. Specifically, as explained at the hearing, TAAA, Inc.'s mission is to assist individual alumni by raising funds for them, as opposed to raising funds to support Takoma Academy, generally.

*See, e.g., Villanova University*, 123 F.Supp.2d at 307 ("the defendant was formed in 1972 with the permission of the University and authorized by the University to raise funds to support Villanova athletics under the corporate name 'Villanova Educational Foundation' and under the trade name 'Wildcat Club.'"). Takoma Academy then appointed a faculty member, Dr. Richard Osborn, and thereafter established the Takoma Academy Alumni Association Constitution and By-Laws. (Pl.'s Hr'g Ex. 19, Takoma Academy Alumni Association Constitution and By-Laws). In fact, as Defendant points out, two (2) members from the Takoma Academy Trustees and two (2) members from the Takoma Academy faculty served on TAAA's Board of Directors – hence, Takoma Academy played a role in overseeing the alumni association's operations. (ECF No. 9-1, at 3). Takoma Academy controlled TAAA's finances and assets as prescribed by the Constitution and By-Laws. (Pl.'s Hr'g Ex. 19, Takoma Academy Alumni Association Constitution and By-Laws). Takoma Academy, rather than the alumni association, also provided gift receipts for tax-exemption purposes to donors who contributed to TAAA. (Pl.'s Hr'g Ex. 6, Plaintiff's Fact Sheet). David Daniels testified that the alumni association conferred with the school on activities, further suggesting that the alumni association operated under the school's control, even if informally. The relationship between the school and the alumni association

suggests that Plaintiff granted an implied license to the alumni association to use Plaintiff's marks under reasonable control of the school.

Even if TAAA, Inc. possessed a license to use the marks or names at issue through its affiliation with Takoma Academy, that license terminated when Plaintiff disassociated on June 7, 2012, shortly after Mr. Pittman filed Articles of Incorporation. *United States Jaycees*, 639 F.2d at 143 ("[t]hrough the Philadelphia group's affiliation with the national organization, the local chapter had the right to use the mark."). Courts have held that "a licensee's right to use a licensor's trademark expires with the termination of their agreement." *Id.; Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F.Supp. 18, 20 n.1 (E.D.N.Y. 1994) ("[a]n agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor."); *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1135 (D.N.J. 1993) (since an implied license is terminable at will, the licensor could properly terminate the license and therefore end the licensee's right to use the mark). Takoma Academy appears to have made its decision to revoke the license clear when it disassociated on June 7, 2012 and later sent Mr. Pittman (and TAAA, Inc.) a second Cease and Desist letter on January 17, 2013, to "cease and desist activities related to or in the name

of "Takoma Academy," "Takoma Academy Alumni Association," "TA" or any derivatives thereof." (Pl.'s Hr'g Ex. 2). David Daniels's testimony supports this point – specifically, he testified that when Pittman formed TAAA, Inc. there was *no* assignment of the name "Takoma Academy Alumni Association" that came with the incorporation.[11]

Defendant contends that TAAA was an independent entity from Takoma Academy, but Plaintiff has provided evidence to support that TAAA clearly existed under Takoma Academy as the "umbrella organization," at the very least overseeing the alumni association's finances. *See Ad Hoc Comm. Of the Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 726 F.Supp. 522, 523 (S.D.N.Y. 1989) (noting that Baruch College recognizes a single alumni association for all of its graduates and "gave *permission* to that organization to use its name – as to which it has a proprietary interest." (emphasis added)). Although in the context of a discrimination claim, the principle enunciated in *Bernard M. Baruch College* is instructive here. Specifically, the opinion provides that:

> [T]he form of organization for conducting
> Baruch College's alumni affairs is one of
> the several forms colleges and/or their
> alumni have adopted to handle the

---

[11] Mr. Daniels also testified that the Board did not transfer assets to the incorporated alumni association and did not give authority to transfer the alumni database and the alumni mailing list.

> relationship. While, as observed, these differ in structural approach, one factor is generally common, which is that there is a single umbrella organization, special interest groups existing, if at all, as affiliates within the larger structure.

*Id.* Furthermore, "[i]t is irrelevant whether the parties *thought* of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties." *Villanova Univ.*, 123 F.Supp.2d at 308. Accordingly, regardless of whether TAAA, Inc. is a legally recognizable successor in interest to TAAA, TAAA used "Takoma Academy" and "Takoma Academy Alumni Association" pursuant to an implied license from Takoma Academy, which Plaintiff revoked when it disassociated on June 7, 2012.

### c. "TA" and "TAAA"

"TA" and "TAAA" are initials/abbreviations for "Takoma Academy" and "Takoma Academy Alumni Association," respectively. "Initials for a descriptive phrase merely represent short forms of the words for which they stand and should receive the same degree of protection as those words." *United States Conference of Catholic Bishops v. Media Research Ctr.*, 432 F.Supp.2d 616, 623 (E.D.Va. 2006); *see also G. Heileman Brewing Co. v. Anheuser-Busch Inc.*, 676 F.Supp. 1436, 1493 (E.D.Wis. 1987) (claiming that, as a practical matter, initials do not differ

significantly in their trademark role from the descriptive words they represent). "An abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will be held to be descriptive." *George & Co.,* 575 F.3d at 394-95 (*citing* 2 Thomas McCarthy, *McCarthy of Trademarks and Unfair Competition* § 11:32 (4th ed. updated Dec. 2013) (collecting cases); *see also id.* § 7:11 ("If a series of letters is merely a recognizable abbreviation for a descriptive or generic term, the abbreviation is also classified as descriptive or generic.").

An abbreviation of a descriptive term may be protectable upon a showing of secondary meaning. *See Metro. Opera Ass'n v. Metro. Opera Ass'n of Chi.*, 81 F.Supp. 127, 129 (D.Ill. 1948) (noting that "MET," short for the descriptive term "METROPOLITAN OPERA" has acquired secondary meaning); *cf. G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 994-99 (7th Cir. 1989) (holding that "L.A." was a descriptive abbreviation for the descriptive words "low alcohol" for beer and no secondary meaning was acquired). As discussed *supra*, to establish secondary meaning, a plaintiff must prove that "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Proof of secondary meaning "entails a rigorous evidentiary standard." *U.S. Search*,

33

300 F.3d at 525. This is especially true when a party seeks to establish that initials pointing to the source of a product have acquired secondary meaning. *See G. Heileman Brewing Co.*, 873 F.2d at 994. Six factors inform whether a party has established secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *U.S. Search*, 300 F.3d at 525 (*citing Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)). Circumstantial evidence can support a finding of secondary meaning. *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005).

The various testimonies from Plaintiff's witnesses and the present record suggest that "TA" and "TAAA" are initials/abbreviations for "Takoma Academy" and "Takoma Academy Alumni Association," and have been widely known as such by students and alumni.[12] *United States Conference of Catholic Bishops*, 432 F.Supp.2d at 623 ("Catholic News Service" was

---

[12] As stated previously, although Plaintiff did not separately register "TA" and "TAAA" as service marks, on May 7, 2013, Plaintiff registered the "Takoma Academy" *design mark*, with the initials "TA" appearing in the middle of the seal, superimposed over each other. The stylized term and year "EST. 1904" appear at the bottom of the seal inside the concentric circles. The certificate of registration indicates that the design mark has been used in commerce on December 31, 2006. (Pl. Hr'g Ex. 65).

merely descriptive, and thus the initials for that name [CNS] were likewise merely descriptive and could only receive protection after a showing of secondary meaning "*in the eyes of the public*." (emphasis added)). Keith Hallam, the Vice President of Education for Potomac Conference, testified that "Takoma Academy" has also been known as "TA" to students, faculty, and friends of the school for over one hundred years, that "TA" has been used continuously on letterhead and signs in front of the school, in emails and newsletters, and that no other school uses "TA." Mr. Hallam also stated that he was not aware of any other schools using that name. He further testified that "Takoma Academy Alumni Association" began over forty years ago. Furthermore, the evidence includes excerpts from the Globe, a newspaper that the alumni association published, in which "TA" and "TAAA" are used as short-hand for "Takoma Academy" and "Takoma Academy Alumni Association," respectively. (*See* ECF Nos 9-5, 17-1, 17-3); *Nat. Cable Television Assoc., Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1574 (Fed.Cir. 1991) ("the undisputed and extensive evidence of record shows that the name 'American Cinema Editors' is frequently shortened to 'ACE' or 'the ACE' by its officers, by members, by film professionals, and in the press and that this usage began long prior to 1979."); *see also id.* at 1578 ("The record before us discloses numerous newspaper articles and

other references to Editors' awards as 'ACE AWARDS' since the 1950s, as well as evidence of Editors' own use of ACE in connection with its award ceremonies since that time.  Whether such usage is deemed analogous to service mark use or further use of its trade name in connection with awards is not material. The wide-spread use by persons in the entertainment industry confirms that the acronym ACE is strongly associated with Editors and its achievement awards.").  Indeed, TAAA, Inc. does not argue that "TA" or "TAAA" lack secondary meaning.  In fact, *Defendant* submitted multiple excerpts from the Globe with references to "TA" and "TAAA."

Instead, Defendant appears to rely on the successor in interest argument in opposing Plaintiff's rights to "TA" and "TAAA."  Specifically, Defendant maintains that it has rights to "TA" and "TAAA" because TAAA, the unincorporated alumni association, used "TA" and "TAAA" since the 1970s.  This argument is misplaced for the same reasons discussed *supra*, namely that, based on the present record, Plaintiff has established the likelihood of success in showing that the alumni association at most had an implied license to use these marks. Furthermore, there is no evidence that any institution other than Potomac Conference or the alumni association – by way of an implied license – used "TA" or "TAAA."  *Cf. FS Servs., Inc. v. Customer Farm Servs., Inc.*, 471 F.2d 671, 674 (7th Cir. 1972)

(holding that plaintiff failed to establish secondary meaning with respect to the letters FS alone because "[o]ther companies operated within the same general market area using the words 'farm supply' and 'farm service' or their abbreviations in their titles or marks.").

Moreover, "[e]vidence of actual confusion also is relevant to determining whether secondary meaning has been established." *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 645 F.Supp.2d 734, 760 (D.Minn. 2009); *see also Lone Star*, 43 F.3d at 936 n.16 ("Even if 'Lone Star' were deemed descriptive, the evidence of actual confusion certainly demonstrates that the mark has acquired secondary meaning in this case."). Here, Plaintiff has offered evidence of actual confusion among alumni because of Defendant's use of "TA" and "TAAA," which further supports that Plaintiff has demonstrated likelihood of establishing secondary meaning. For instance, Sharon Froom, a 1976 Takoma Academy alumna, testified that she received emails from both alumni associations and was confused about which organization was affiliated with the school. The evidence reflects that Ms. Froom sent an email to Ron Mills stating:

> It is difficult to know which emails are from TA officially and which ones are from the Pittman Alumni association. I recommend that you use a logo and the TA address on every email and I recommend you put this in the header . . . I am busy and often scan emails quickly. I found it difficult to

> remember all the names and players and to
> figure out whether an email or event was
> real or "fake."

(Pl.'s Hr'g Ex. 62).   Furthermore, Defendant created a Facebook page entitled "The Official Takoma Academy Alumni Association (TAAA)."   Dr. Hamlet Canosa testified that he was confused and joined this page thinking it was the page of the "official" alumni association.   (*See also* Pl.'s Hr'g Exs. 45-51). Similarly, Defendant created a *LinkedIn* page on January 29, 2013, referencing "TAAA," which provides that "TAAA is a year-round service-oriented association that serves Takoma Academy alumnus, current students & faculty and the surrounding community." (Pl.'s Hr'g Ex. 43).   David Daniels also testified that there was actual confusion, as he received inquiries from alumni who donated to TAAA, Inc., but did not receive a tax-exemption receipt from Plaintiff, as was the case when alumni previously donated to TAAA. *See, e.g.*, *Am. Ass'n for Justice v. The American Trial Lawyers Ass'n*, 698 F.Supp.2d 1129, 1143 (D.Minn. 2010) (finding evidence of actual consumer confusion persuasive in determining secondary meaning; evidence of actual confusion included individual sending membership dues to Defendant because "[He] thought [he] was sending membership dues to ATLA (Association of Trial Lawyers of America) because [the Association's] name and logo appear to be almost identical"; evidence of actual confusion also included statement from

another individual stating that "[b]ecause of the obvious similarity of the terms 'The American Trial Lawyers' Association' and 'The ATLA' to the terms Association of Trial Lawyers of America and ATLA, I mistakenly believed that this solicitation had been sent by the organization I know as ATLA and the Association of Trial Lawyers of America."). The testimony adduced at the hearing and the present record reflect that Plaintiff has established the likelihood of success in showing that the relevant consumers – Takoma Academy alumni – associate "TA" and "TAAA" with Plaintiff and Defendant's use thereof has caused confusion over TAAA, Inc.'s association with Plaintiff.

Based on the foregoing, Plaintiff has shown a likelihood of establishing that "TA" and "TAAA" have acquired secondary meaning and are thus protectable.

### 2. Defenses

Defendant raises fair use, laches, and acquiescence as defenses to the use of "Takoma Academy."

### a. Fair Use Doctrine:

Defendant argues that:

> [a]bsent a claim to the name 'Takoma Academy,' it is unclear what legal interest, if any, the Potomac Conference actually has in any alumni association at all. And even if a valid and protectable trademark existed (which it does not), TAAA, Inc. use would nonetheless be defensible under 15 U.S.C. §

> 1115(b), for example under the fair use
> doctrine.

(ECF No. 17, at 6). Defendant contends that Plaintiff merely
objects to Defendant's use of the name "Takoma Academy," and
there is no other way for TAAA, Inc. to describe its members.
(*Id.* at 7 n.6).

Fair use is defined as "a use, otherwise than as a mark, .
. . of a term or device which is descriptive of and used fairly
and in good faith only to describe the goods or services of such
party, or their geographic origin." 15 U.S.C. § 1115(b)(4).
The analysis in *Villanova Univ. v. Villanova Alumni Educ.
Found., Inc.* is instructive. The defendant in that case also
argued that it was not using "Villanova" or "Villanova Alumni"
in a trademark sense but in a descriptive sense. 123 F.Supp.2d
at 303. In rejecting this argument, the court reasoned that the
"'fair use' doctrine does not apply when the defendant's use of
the mark in question 'implicate[s] the source-identification
function that is the purpose of trademark' . . . The defendant's
prominent use of 'Villanova' and 'Villanova Alumni' in its name
and logo, however, is not descriptive use." *Id.* The opinion
explained that the "use of protected marks in a name and logo is
precisely the use as an 'attention-getting symbol' . . . The
defendant uses its name and logo on all of its written materials
and on the homepage of its website." *Id.* at 304.

Here too, based on the current record, Defendant's use of the marks does not appear to be descriptive. Defendant's missives to alumni suggest affiliation with Potomac Conference, as evidenced by testimony that alumni understood Defendant's emails to be from the alumni association affiliated with Potomac Conference and testimony from Mr. Daniels that alumni have donated to TAAA, Inc. under the false impression that they would receive tax-exempt receipts from Potomac Conference, as was the case when they had donated to TAAA. Furthermore, Defendant prominently displays "Takoma Academy" on its Facebook page and on *LinkedIn*. (ECF. Nos. 12-3, 12-5, 12-6). Such actions indicate a desire to associate with Plaintiff. *See, e.g., Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 489 (5th Cir. 2008) (explaining that "[i]n order to avail [itself] of the nominative fair use defense 'the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder.'"). Moreover, the evidence thus far reflects that Defendant continues using the "Takoma Academy" mark irrespective of the two cease and desist letters from Plaintiff – this supports Plaintiff's position that Defendant may not be using "Takoma Academy" in good faith. Accordingly, the present record does not support this defense.

### b. Laches

"In a trademark case, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." *Sara Lee*, 81 F.3d at 461. In determining whether laches may operate as a defense to an infringement claim, a court should consider the following factors: (1) whether the owner of the trademark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user has been unduly prejudiced by the owner's delay. *Brittingham*, 914 F.2d at 456. The doctrine, however, is sparingly applied where, as here, a plaintiff seeks only equitable relief. *See Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 212 (4th Cir. 1982) ("While the availability of laches as a defense to claims for injunctive relief may be limited . . . laches will bar a claim for damages for bad faith infringement.").

The record does not reflect that Plaintiff unreasonably delayed bringing this case. To the extent that a plaintiff's prior knowledge may give rise to the defense of estoppel by laches, such knowledge must be of a *pre-existing*, infringing use of a mark. As discussed *supra*, Plaintiff has demonstrated that the alumni association had an implied license to use Plaintiff's

marks. Notably, after Pittman formed TAAA, Inc. and continued using the marks, Plaintiff sent a Cease and Desist letter to TAAA, Inc. in June 2012 – two months after the alumni association proposed incorporation – thereby revoking the license. (ECF. No. 1 ¶ 18). Plaintiff sent a second cease and desist letter on January 17, 2013, and filed the pending action three months thereafter, after failed attempts at resolution. (*Id.* ¶ 24.). Furthermore, in consideration of the public interest, estoppel by laches may not be invoked to deny injunctive relief if it is apparent that the infringing use is likely to cause confusion. *See Sara Lee*, 81 F.3d at 462; *Univ. of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044 (3[d] Cir. 1982) ("Because laches is an equitable doctrine, its application is inextricably bound up with the nature and quality of the plaintiff's claim on the merits relevant to a prospective injunction."). As the Fourth Circuit recognized, the trademark owner "has no obligation to sue until 'the likelihood of confusion looms large.'" *Sara Lee*, 81 F.3d at 462. The Fourth Circuit has also held "strong proof of likelihood of confusion – indeed, actual confusion – trumps the defenses of laches and acquiescence." *Resorts of Pinehurst, Inc. v. Pinehurst Nat. Corp.*, 148 F.3d 417, 423 (4th Cir. 1998). Plaintiff has demonstrated the likelihood of establishing that Defendant's use of the marks creates a likelihood of confusion. Accordingly,

43

based on the record, Defendant's laches defense is similarly unavailing.

### c. **Acquiescence**

The doctrine of acquiescence bars an infringement action only when the trademark owner, through "affirmative word or deed, expressly or impliedly consents to the infringement." *Sara Lee*, 81 F.3d at 462. Acquiescence requires evidence of active, not merely passive consent by the trademark owner. *Id.* Defendant argues that by allowing the *unincorporated* alumni association to use the marks continuously since the alumni association's establishment in the 1970s, Plaintiff acquiesced to the marks' use. Estoppel by acquiescence requires that the trademark owner knowingly and actively consent to the defendant's *infringing use* of the mark. At this point, there is no indication that Plaintiff affirmatively acquiesced to TAAA, Inc.'s use of the marks, especially in light of the two cease and desist letters it sent to Defendant upon learning of its use of the marks.[13] Moreover, public policy dictates that – like the doctrine of estoppel by laches – estoppel by acquiescence not be rigidly applied in cases where the likelihood of confusion is apparent. As set forth in detail below, Plaintiff has

---

[13] Indeed, Mr. Hallam testified that soon after incorporation, he became concerned that TAAA, Inc. functioned as an independent entity from Potomac Conference but continued to use the school's name.

demonstrated the likelihood of establishing that Defendant's use of the marks creates a likelihood of confusion. Accordingly, the present record also does not support this defense.

### 3. Likelihood of Confusion

The Fourth Circuit has advised that "[t]he ultimate question, for purposes of determining liability in [Section 1125(a)] trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed simply confused, as to the source of the goods in question." *Perini Corp.*, 915 F.2d at 127 (internal quotation marks and citations omitted). A likelihood of confusion exists "if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006) (internal citation and quotation marks omitted). In evaluating whether such confusion exists, the court "look[s] to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.*

The Fourth Circuit's likelihood of confusion case law instructs courts to consider nine factors:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks

45

> identify; (4) the similarity of the
> facilities used by the markholders; (5) the
> similarity of advertising used by the
> markholders; (6) the defendant's intent; (7)
> actual confusion; (8) the quality of the
> defendant's product; and (9) the
> sophistication of the consuming public.

*George & Co.*, 575 F.3d at 393; *see also Ga. Pac. Consumer Prods., Inc. v. Von Drehle Corp.*, 618 F.3d 441, 454 (4th Cir. 2010). The Fourth Circuit has emphasized, however, that all of the factors are not always relevant or of equal importance in every case. *George & Co.,* 575 F.3d at 393. Moreover, while evidence of actual confusion is not required, it is the "most important factor." *Id.* at 398; *see also Lone Star*, 43 F.3d at 937 (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion"). Finally, "[i]t has been stated that in trademark infringement cases, the trial judge may draw on [her] own experience and observation to make an informed judgment as to likelihood of confusion." *The Citrus Grp., Inc. v. Cadbury Beverages, Inc.*, 781 F.Supp. 386, 390 (D.Md. 1991).

Careful consideration of the foregoing factors and the evidence submitted by the parties leads to the conclusion that Plaintiff has established the likelihood that it will make the requisite showing of likelihood of confusion.

## a. Similarity of Marks, Services, and Advertising

The similarity of the marks used by both parties is undisputed here.[14] Furthermore, "Takoma Academy" is the dominant part of Takoma Academy Alumni Association, Inc. *See World Gym Licensing, Ltd. v. Fitness World, Inc.*, 47 F.Supp.2d 614, 621-622 (D.Md. 1999) (stating that, in "evaluating the similarity of two trademarks, greater weight [should be] given to the dominant or salient portions of the marks" (internal citations omitted); *Lone Star*, 43 F.3d at 926 n.1, 936 (the phrase "Lone Star" is the dominant mark in the names "Lone Star Grill" and in the alleged infringer's name "Lone Star Café" where both entities were involved in restaurant service); *Philip Morris, Inc. v. Imperial Tobacco Co. (of Great Britain and Ireland), Ltd.*, 251 F.Supp. 362, 380 (E.D.Va. 1965) (finding that the word "PLAYER'S" was the "distinguishing, dominant, and salient feature" of the trademark although "PLAYER'S Navy Cut" was the complete registered mark; defendant had no right to use the dominant feature "PLAYER'S" either alone or in combination with other words). Here, Defendant uses both "Takoma Academy Alumni Association" and "Takoma Academy Alumni Association, Inc." and derivatives thereof in its advertising efforts; the dominant part of both is "Takoma Academy." (*See, e.g.,* Pl.'s Hr'g Ex. 36

---

[14] In the opposition, Defendant also does not dispute the strength or distinctiveness of the marks at issue.

(announcement from TAAA, Inc. about appointment of Board of Directors under the heading "Takoma Academy Alumni Association")).

Moreover, TAAA, Inc. uses "Takoma Academy," "TA," "Takoma Academy Alumni Association," and "TAAA" to identify the same services that Plaintiff provides to alumni. Defendant contends that Plaintiff and Defendant offer different services in that TAAA, Inc. is an alumni association offering "benevolent services to its members, Takoma Academy faculty and students, such as fraternity, charity and connectivity," whereas "[c]onsumers of Potomac Conference's services are typically fourteen-to eighteen-year-olds and their parents and/or guardians." (ECF No. 17, at 8). Defendant maintains that in contrast to consumers of Potomac Conference's services, "consumers of TAAA, Inc. services are graduates and former students of the institution that may no longer have any connection to the school other than the fact they attended the school at some point in their lives." (*Id.*). This argument is misplaced. As noted in *Villanova*, "the defendant's argument that the University does not use 'Wildcats' in connection with charitable services is of no moment given the strong connection . . . among this audience between 'Wildcats' and Villanova University." 123 F.Supp.2d at 306 n. 17. Analyzed in context, the record reflects that the parties target the same audience

48

when soliciting alumni donations, fundraising, or hosting alumni events. Of import here, Potomac Conference still operates an alumni association, TAAA. (*See* ECF No. 12-3 (Affidavit of Takoma Academy)). As a result, evidence on the record suggests that TAAA and TAAA, Inc. *both* offer virtually identical, if not the same services, except that TAAA, Inc. intends to use the money raised from alumni for a different purpose than Potomac Conference – namely, to benefit individuals rather than the school generally. *See, e.g., Tropical Nut & Fruit Co. v. Forward Foods*, LLC, No. 3:13-cv-131, 2013 WL 2481521, at *3 (W.D.N.C. June 10, 2013) ("[A]lthough the parties seem to be targeting different consumers, the Court finds that the goods sold by both parties serve the same purpose, which is to provide the consumer with a healthy food product, whether it is being marketed to those concerned with weight or diabetes, those who are elderly, college students concerned about their health . . . Both parties are trying to sell their goods as health food products."). Both parties appear to provide competing alumni services and solicit funds from alumni. "[W]here the parties offer competing goods or services, the Court 'need rarely look beyond the mark itself' to determine whether likelihood of confusion exists." *Villanova*, 123 F.Supp.2d at 306 (*quoting Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3rd Cir. 1991); *see also SunAmerica Corp. v. Sun Life Assurance*

49

*Co. of Canada*, 890 F.Supp. 1559, 1575 (N.D.Ga. 1994) ("[w]here the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products.").

Furthermore, both parties appear to use nearly identical advertising. *See, e.g., Metro Publ'g, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993) (a likelihood of confusion exists when consumers "are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.") (citations and internal quotation marks omitted). Indeed, Defendant acknowledges that "there is some overlap in activities and audience." (ECF No. 17, at 8). Specifically, Defendant concedes that "both parties often run fundraisers for the benefit of the institution and its current students. Potomac Conference may reach out to members of the alumni association for donations to the school; and TAAA, Inc. may reach out to current students as prospective members." (*Id.* at 9). Both parties communicate with alumni to solicit donations through "mailings, social media, advertisements, and social gatherings" using similar, if not identical, marks. *See Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 488 (1986) (finding high degree of similarity between marks where both corporations had in

common pregnancy testing and counseling services for pregnant women; "[t]he so-called services are similar, as are the prospective clients."); *Villanova*, 123 F.Supp.2d at 306 ("Both Villanova University and Defendant use the designations 'Villanova,' 'Villanova Alumni,' 'Wildcat' and 'Villanova Wildcats' to indicate collective membership in a group of individuals with a common interest – the activities of Villanova University.").

### b. Actual Confusion

Evidence of actual confusion is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion." *Lone Star*, 43 F.3d at 937; *see also HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 719 (9th Cir. 1974) (reasoning that actual confusion is "determinative in many instances" in finding trademark infringement). "This is so for the obvious reason that if there is evidence of substantial actual confusion, or, on the other hand, evidence that there is no substantial actual confusion, such evidence will often by itself answer the question as to whether there is a 'likelihood of confusion,' between the . . . marks at issue." *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F.Supp.2d 646, 654 (D.Md. 2002).

Despite Mr. Pittman's statement at the preliminary injunction hearing that "there is no confusion, just questions," there is evidence on the record of actual confusion among Takoma

Academy alumni and donors to the alumni association. Sharon Froom and Dr. Hamlet Canosa testified that they were confused. Specifically, Ms. Froom testified at the hearing that she received emails from both alumni associations and was confused about which one was actually affiliated with Takoma Academy.[15] On April 28, 2013, she sent an email expressing this confusion to Ronnie Mills. (Pl.'s Hr'g Ex. 62). Dr. Canosa testified that he joined Defendant's Facebook page thinking it was associated with Plaintiff. David Daniels testified that he received inquiries from individuals who contributed to TAAA, Inc. for purposes of raising money for the "worthy students fund," and thus expected a tax-exemption receipt from Potomac Conference, which was the common practice. Keith Hallam also submitted an affidavit stating that "[s]everal Takoma Academy alumni have contacted the school via email regarding their

---

[15] The record reflects that Defendant makes statements such as "TAAA, Inc., your alumni association" in communications to alumni. (Pl.'s Hr'g Ex. 32, Letter from Henry Pittman dated March 8, 2013). Defendants also make reference to TAAA in advertising alumni events. (See *id*. ("[w]e are excited to announce that your TAAA Alumni Golf Tournament is back for a 14th Year!")). Defendant further advertises alumni events referencing "Takoma Academy Alumni Association." (Pl.'s Hr'g Ex. 33, March 15, 2013 Notice from TAAA, Inc. about an upcoming golf tournament). In such advertisements, Defendant addresses "[f]ellow TA Alumni & Friends of TAAAA." (*Id*.). Defendant also uses "Takoma Academy Alumni Association" and "Takoma Academy Alumni Association, Inc." interchangeably. (Compare Pl.'s Hr'g Exs. 33 & 34 – both are advertisements but source is identified as Takoma Academy Alumni Association in one and Takoma Academy Alumni Association, Inc. in another).

confusion over the purported affiliation between TAAA, Inc. and Takoma Academy." (ECF No. 12-3 ¶ 2). Specifically, one individual wrote to Ron Mills, stating: "are you from the Official Alumni Association or the ones claiming to be the Alumni Association. It's very confusing." (ECF No. 12-7, at 3). Another individual wrote, "I wish I could understand what is going on with this alumni issue. I thought they were doing a good job and raised all that money last year. I am so confused and I'm sure I'm not alone." (*Id.* at 7); *see, e.g., Resorts of Pinehurst, Inc.*, 148 F.3d at 422 (noting that evidence of actual confusion is paramount in the "likelihood of confusion" analysis).

The record and testimony at the hearing highlights instances of actual confusion and on the whole, suggests that Plaintiff has demonstrated that it will likely succeed in establishing likelihood of confusion on the part of alumni and donors to the alumni association. Thus, the foregoing evidences that Plaintiff established likelihood of success on the merits.

**B. Irreparable Harm**

To justify an injunction before trial on the merits, the plaintiff must show that the irreparable harm it faces in the absence of preliminary relief is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992).

Without a showing that the plaintiff will suffer imminent, irreparable harm, the court cannot grant preliminary injunctive relief. *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 360 (4th Cir. 1991).

Plaintiff is likely to suffer irreparable harm from Defendant's continued unauthorized use of its marks. "Generally, a finding of irreparable harm is automatic in a trademark infringement case where the trademark holder has demonstrated unlawful use and the likelihood of consumer confusion." *Prosperity Sys., Inc. v. Ali*, No. CCB-10-2024, 2010 WL 5174939, at \*5 (D.Md. Dec. 15, 2010); *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) ("[A] licensor who establishes a likelihood of confusion as to product source in a trademark infringement suit simultaneously demonstrates the requisite irreparable harm essential to obtaining a preliminary injunction."). Thus far, Plaintiff has demonstrated a likelihood of success on the merits on its trademark infringement claim. This, in and of itself, provides strong evidence of irreparable harm. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 273 (4th Cir. 2002) ("In Lanham Act cases involving trademark infringement, a presumption of irreparable injury is generally applied once the plaintiff has demonstrated a likelihood of confusion, the key element in an infringement

case."); *Lone Star*, 43 F.3d at 938 (noting that a finding of irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears"). Furthermore, in *Pizzeria Uno*, the Fourth Circuit quoted with approval Judge Learned Hand's long-recognized pronouncement that, "if another uses [someone's trademark], he borrows the owner's reputation whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use." *Pizzeria Uno*, 747 F.2d at 1535 (*quoting Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2$^\text{d}$ Cir. 1928)); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4$^\text{th}$ Cir. 1991) (trademark infringement and unfair competition claim where court found that oil wholesaler's use of oil company's trademark was likely to confuse and deceive consumers.).

Plaintiff provided sufficient evidence that it is likely to suffer irreparable harm because it has lost control over its marks due to Defendant's continued unauthorized use, and thus Plaintiff has no control over the quality of services provided to alumni under the "Takoma Academy" name. *Merry Maids Ltd. P'ship v. Kamara*, 33 F.Supp.2d 443, 445 (D.Md. 1998) ("Defendants' unauthorized use of plaintiff's trademarks gives rise to irreparable injury, in that plaintiff has lost control of its business reputation to this extent, there is a

substantial likelihood of confusion of the purchasing public, there may be no meaningful monetary recovery available, and there is an inherent injury to the good will and reputation of the plaintiff."). Ronnie Mills, assistant to the principal for fundraising and alumni affairs, testified that TAAA, Inc.'s use of the marks has hurt fundraising and contributions to the "worthy student fund," although he averred that there was no way to quantify the damage. Mr. Mills also testified that Plaintiff lost control of its name as a result of TAAA, Inc.'s use; that TAAA's Inc.'s use has harmed the school's reputation; that there is potential that parents may no longer want to enroll their children in Takoma Academy as a result; and that this battle for the use of the marks and names between two competing alumni associations of the same school has caused some to become apathetic. *See Ad Hoc Committee of Baruch Black and Hispanic Alumni, Ass'n*, 726 F.Supp. at 524 ("Since the BCAA is a relatively small organization, the College justifiably fears that solicitation efforts by a separate alumni group would unduly burden and possibly alienate alumni."). In fact, Manny Montero, an attorney representing TAAA, Inc. has stated that "the issue has driven people away from the association, the school and the church." (Pl.'s Hr'g Ex. 52, May 8, 2013 article from Gazette.Net).

The present record supports Plaintiff's position that its reputation will be damaged because a "potential alumni donor of Plaintiff who donates to TAAA, Inc. under the mistaken impression of Plaintiff or their services will have that negative impression of Plaintiff and its services, and likely will convey that blemish on Plaintiff's reputation to others." (ECF No. 12-1, at 26). Plaintiff has demonstrated that Defendant's use of the marks at issue deprives Plaintiff of its good will and reputation and that Plaintiff will suffer irreparable harm absent injunctive relief.

**C. Balance of the Equities**

The balance of the equities also tips in Plaintiff's favor. As discussed above, Defendant's continued use of the marks adversely affects Plaintiff's control over its goodwill and reputation, which makes it likely that Plaintiff would suffer irreparable harm as a result. At the hearing, Defendant represented that "[i]f [they] are enjoined from fundraising in alumni connections, [the] organization dies." (ECF No. 27, at 64). Defendant asserted that using a different name would hinder its ability to advertise to its members" and consequently its existence. (*Id.* at 65). Defendant asserts that a preliminary injunction would be "devastating."

The court's analysis in *Prosperity* is instructive on this point. That case involved a franchisee's continued use of the

"PIZZA BOLI'S" marks even after termination of the franchise agreement. In balancing the equities, the court reasoned that "[e]njoining [Defendant] from using the PIZZA BOLI's mark, however, does not necessarily preclude him from operating a pizza business under his own name. Moreover, any loss of business he might suffer from not being linked to the PIZZA BOLI's name is likely compensable in monetary damages." 2010 WL 5174939, at *5. Similarly, despite TAAA, Inc.'s protestations, it appears that Defendant may continue providing alumni services to Takoma Academy alumni under a different name.

Defendant further contends that "[t]he sole purpose and mission of TAAA, Inc. is to provide community, fraternity and charity within and between the Takoma Academy and alumni communities. An injunction that effectively prohibits TAAA, Inc. from any one or all of those activities would destroy the only connection between its members." (ECF No. 17, at 12-13). The *Villanova* court rejected this very argument, reasoning that "it does not suffice to argue that the defendant in this case is not using the marks 'in an unwholesome or disparaging manner,' but for 'charitable purposes which benefit the students of [the University].'" 123 F.Supp.2d at 310. Indeed, a preliminary injunction barring use of the marks at issue still allows Defendant to fundraise and host events for students and alumni. Furthermore, based on the evidence thus far, Defendant used the

marks at best under an implied license; Defendant's continued use of the marks after Plaintiff has revoked the license may "subject plaintiff in the public mind to responsibility for the action of a group over which it has no further control." *Grand Lodge v. Eureka Lodge No. 5*, 114 F.2d 46, 48 (4th Cir. 1940). This further supports the conclusion that on balance, the risk of harm to Plaintiff is particularly acute.

### D. Public Interest

The public interest also weighs in favor of enjoining Defendant's continued use of "Takoma Academy," "TA," "Takoma Academy Alumni Association," and "TAAA." "The purpose of a trademark is to protect the public from confusion about 'the identity of the enterprise from which goods and services are purchased.'" *Toolchex, Inc. v. Trainor*, 634 F.Supp.2d 586, 594 (E.D.Va. 2008) (*quoting AMP Inc. v. Foy*, 540 F.2d 1181, 1185-86 (4th Cir. 1976)); *see also Merry Maids,* 33 F.Supp.2d at 446 ("Preventing infringement . . . serves the public interest in preventing consumer confusion."). *Prosperity Systems, Inc.* held that the public interest was best served by preventing the defendant from using Pizza Boli's trademark in his pizza business because consumers believed that they were getting Pizza Boli's pizza made from officially approved ingredients, which was not the case. No. CCB-10-2024, 2010 WL 5174939, at *6. Similarly, at this stage, Plaintiff has offered sufficient

evidence that Takoma Academy alumni and donors to the alumni association believe that TAAA, Inc. is affiliated with Plaintiff, which is not the case. In a service mark case such as this one, public interest "is most often a synonym for the right of the public not to be deceived or confused." *Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197-97 (3[d] Cir. 1990) (internal citations omitted). Although Defendant asserts that it is not a competitor to Potomac Conference or Takoma Academy, and "alumni can donate to either or both organizations without issue," (ECF No. 17, at 14), Plaintiff has sufficiently established that Defendant's use of the marks creates, at the very least, a *likelihood* of confusion as to affiliation and source, especially considering that Plaintiff continues to operate an alumni association. (ECF No. 12-3 ¶ 5, Affidavit of Takoma Academy, "the unincorporated association, known as the Takoma Academy Alumni Association, continues to exist."). Indeed, testimony and emails from alumni provide ample evidence of confusion as to which alumni association is affiliated with Takoma Academy and to which they should donate. Based on the foregoing, the requested preliminary injunction is in the public interest.

In sum, Plaintiff has demonstrated that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent preliminary injunctive relief, and because the

balance of the equities and the public interest also tip in Plaintiff's favor, Plaintiff's motion for a preliminary injunction will be granted.

**E.    Bond**

Pursuant to Federal Rule of Civil Procedure 65(c), a district court must fix a bond whenever it grants a preliminary injunction.    The district court has discretion in fixing the amount for the security bond, and in circumstances where the risk of harm is remote, a nominal bond may suffice.    *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).    The Fourth Circuit explained:

> In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order.    The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party.

*Id.*

Plaintiff argues that the bond should be waived because no damages will result to TAAA, Inc.    (ECF. No. 12, at 23). Plaintiff explains that TAAA, Inc. is a new entity formed on April 2012 and thus has not "invested a substantial amount of time and effort in promoting their services in comparison to the time, effort, and funds Takoma Academy has devoted since being

established in 1904." (*Id.*). Although Defendant argues that TAAA, Inc. and Mr. Pittman "have incurred substantial attorneys' fees and costs by being forced to file a Motion to Dismiss and Opposition to a Motion for Preliminary Injunction," (ECF No. 17, at 15), Defendant does not provide any input as to the amount of damages it would sustain should it later be determined that Defendant was wrongfully enjoined. There does not seem to be a substantial risk of harm to Defendant and Plaintiff has demonstrated a likelihood of success on the merits. *See, e.g., International Controls Corp. v. Vesco*, 490 F.2d 1334 (2[d] Cir. 1974) (approving district court's fixing bond amount at zero in the absence of evidence regarding likelihood of harm); *Prosperity Systems, Inc.*, No. CCB-10-2024, 2010 WL 5174939, at *6 (setting bond in the amount of $5,000 where the risk of harm was remote). Defendant is a newly incorporated association and does not seem to rely on alumni contributions for its own livelihood.

In the absence of any meaningful evidence to assess the amount of the bond, requiring Plaintiff to post a bond in the amount of $2,000 appears reasonable under the circumstances, without prejudice to the ability of either party to seek to modify the amount in a future proceeding.

**F.    Request for Attorneys' Fees**

Both parties seek attorneys' fees.  At this stage of the litigation, it is premature to award attorneys' fees.  Courts of the United States, including the federal courts, follow the "American Rule," meaning that each party to a lawsuit must bear its own attorneys' fees unless there is an express statutory authorization to the contrary.  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).  Under the American Rule, each party must also bear its own litigation costs except a limited number of enumerated costs (*e.g.,* filing fees and deposition transcripts) that are awarded to a prevailing party under Rule 54(d) of the Federal Rules of Civil Procedure.  Plaintiff is not a "prevailing party" because the legal relationship between the parties was not altered by the granting of Plaintiff's motion for a preliminary injunction.  *See Sole v. Wyner*, 551 U.S. 74, 82 (2007) (holding that "[t]he touchstone of the prevailing party inquiry . . . is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute" and declining to find the plaintiff a prevailing party where it obtained a preliminary, but not permanent injunction).

Nor is this an exceptional case under Section 35(a) of the Lanham Act, which provides that a court may award attorneys' fees to the prevailing party in "exceptional cases."  15 U.S.C.

§ 1117(a).  A case is exceptional when the conduct of the losing party is "malicious, fraudulent, deliberate, and willful."  *Id.* at 600.  Other factors to be considered in determining whether a case is exceptional include economic coercion, groundless arguments, and failure to cite controlling law.  *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000).  The good faith, but ultimately unsuccessful, assertion of a questionable claim or controversial legal theory does not suffice to warrant an award of attorney's fees, even if it turns out to be expensive for the prevailing party.  *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001) (concluding that defendant who had acted in "bad faith" for purposes of the Anticybersquatting Consumer Protection Act was not liable for attorney's fees because the conduct did not rise to the level of "malicious, fraudulent, willful or deliberate" because defendant had a genuine belief that he had a right to use the mark).  Here, neither party's conduct appears to rise to the level of "malicious, fraudulent, willful or deliberate."  Nor does this seem to qualify as an "exceptional case."  Accordingly, the request for attorneys' fees by both parties is inappropriate at this juncture.

## III. Conclusion

For the foregoing reasons, Plaintiff's motion for a preliminary injunction will be granted. Defendant's motion to strike will be denied. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
